NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SALVATORE MORTILLARO and VICTORIA STILLO,<br><br>      *Plaintiffs*,<br><br>    v.<br><br>D. MARULANDA, in his individual capacity as Officer for the New Jersey Transit Police Department, *et al.*,<br><br>      *Defendants*. | Civil Action No. 23-1479<br><br>**OPINION** |

**SEMPER,** District Judge.

This matter comes before the Court on the motion for summary judgment filed by Defendants (collectively Officers D. Marulanda ("Officer Maulanda"), A. Konopka ("Officer Konopka"), and E. Tyler ("Officer Tyler") of the New Jersey Transit Police Department). (ECF 21-4, "Def. Br.")  Plaintiffs Salvatore Mortillaro and Victoria Stillo filed an opposition.[1] (ECF 26-1, "Pl. Opp.")  Defendants filed a reply. (ECF 18, "Def. Reply".)  This Court reviewed all submissions made in support of and in opposition to the motion and held oral argument with the parties on March 6, 2025.  For the reasons set forth below, Defendants' motion is **GRANTED**.

---

[1] The parties agreed by consent order to dismiss Plaintiff Victoria Stillo's loss of consortium claim with prejudice.  (ECF 33.)  Because loss of consortium was the only claim on which Plaintiff Stillo could recover, she is hereby **DISMISSED** from this action.  Any reference herein to "Plaintiff" refers specifically to Plaintiff Salvatore Mortillaro.

I.     **FACTS AND PROCEDURAL HISTORY**[2]

This case arises from an incident on March 19, 2021, when Defendant Officers Marulanda and Tyler effectuated the lawful arrest of Plaintiff on a platform at Newark Penn Station. (ECF 22, "Def. SOMF" ¶ 3.) At 3:23 p.m., a New Jersey Transit crew member approached Officers Marulanda and Tyler and informed them that an individual had just "put a needle in his arm and collapsed" in the seventh car bathroom of train 7525. (*Id.* ¶ 4.) When the officers arrived, Plaintiff was seated outside the bathroom reaching for a needle below him. (ECF 21-6, Marulanda Body Worn Video, "Def. Ex. 2" at 18:11.) The conductor informed the officers that he found Plaintiff on the ground of the bathroom with a needle underneath him, and that he "deals with this guy three times a week." (Def. Ex. 2 at 17:50; *see also* ECF 21-7, Incident Report, "Def Ex. 3" at 3.) Plaintiff admits he injected himself with ketamine, a drug he was not prescribed, in the train bathroom. (Def. SOMF ¶ 7; ECF 21-11, "Def. Ex. 7" ¶ 17.) The officers asked Plaintiff multiple times what the needle was for, if he was experiencing a medical emergency, or if he was diabetic. (Def. Ex. 2 at 18:35-20:04.) Plaintiff did not respond to any of the officers' questions. (*Id.*) The officers removed Plaintiff from the train and continued their questioning on the platform. (*Id.* at 20:36.)

Plaintiff was visibly intoxicated and non-compliant with the officers' requests. (*Id.* at 21:38-25:43.) Plaintiff's speech was slurred, and he struggled to maintain his balance while standing. (*Id.*; Def. Ex. 3 at 3.) The officers noticed track marks on Plaintiff's hands, which

---

[2] The factual background is drawn from briefs, depositions, declarations, interrogatories, and the parties' submissions regarding undisputed materials facts. (*See* ECF 21, 22, 26, 28.) The entire interaction between Defendant Officers and Plaintiff is captured on video surveillance through body-worn camera (Def. Exs. 2, 10, 11, 12) and footage from the platform. (ECF 21-12, "Def. Ex. 8")

2

appeared to have been caused by a hypodermic needle, and observed Plaintiff's pupils were "pinpoint," which is characteristic of opioid use. (Def. Ex. 3 at 3.) Plaintiff refused to answer the officers' questions directly, including simple questions like "where are you going" and "where did you get on this train?" (Def. Ex. 2 at 22:16.) Over the course of their interaction, Plaintiff reached into his pockets, as well as an opaque black shopping bag that he was carrying, over six times, despite repeated orders from the officers to refrain from doing so. (*Id.* at 18:11-24:41.) Plaintiff did not disclose what was in the shopping bag or if he had any other needles or weapons on his person, despite being asked repeatedly. (*Id.* at 22:47.) The officers informed Plaintiff that he was under arrest and requested that he put his hands behind his back on two separate occasions. (*Id.* at 25:32-25:50.) Plaintiff refused. (*Id.*) The officers then attempted to handcuff Plaintiff, who resisted by stiffening his arms to escape their grasp. (*Id.* at 25:40.) Officer Marulanda can be heard on body worn camera footage telling Plaintiff to "stop resisting, stop tensing up, you're tensing up, relax." (*Id.* at 25:52-26:01.)

Surveillance footage from the platform provides a clear view of what happened next. (*See* Def. Ex. 8 at 1:05.) While the officers were trying to place handcuffs on the Plaintiff, Plaintiff raised his arms and buried them into his body to evade the officers' arrest. (*Id.* at 1:07.) Plaintiff then backpedaled on the platform and can be seen grabbing Officer Marulanda's arm to try and break free of the officer's hold. (*Id.* at 1:09.) Officers Marulanda and Tyler struggled to control Plaintiff, who then moved forward and spun around in further attempt to escape their grasp. (*Id.* at 1:11.) Officer Marulanda then brought Plaintiff, who was already in forward movement, to the ground, which caused all three men to fall on the platform. (*Id.* at 1:19.) The struggle lasted approximately ten seconds. (*Id.* at 1:06-1:15.) The officers then successfully placed handcuffs on Plaintiff, who immediately called out in pain. (*Id.* at 1:24.) Plaintiff suffered a dislocated left hip

and a fractured left pelvis from the fall. (ECF 1, "Compl." ¶ 11.) The arrest took place at 3:34 p.m. (Def. SOMF ¶ 24; Def. Ex. 2 at 26:25.)

Sergeant Scott Wachterhauser, unnamed in this lawsuit, arrived on scene shortly after the arrest and at 3:39 p.m. requested emergency medical services to evaluate and treat Plaintiff's injuries. (ECF 21-3, "Wachterhauser Decl." at ¶ 10.) Sergeant Wachterhauser can be heard on body worn camera footage making the initial request for emergency medical services and dispatch can be heard confirming his request.[3] (Def. Ex. 2 at 30:21-30:36.) Officer Marulanda's body worn camera also captures Sergeant Wachterhauser informing Plaintiff at 3:39 p.m. that "I've got EMS coming." (*Id.* at 31:08.) Sergeant Wachterhauser followed up with dispatch on two additional occasions to check the status of EMS's response.[4] (Wachterhauser Decl. ¶ 12.) At 4:44 p.m., Officer Marulanda informed Plaintiff that the officers had called EMS three times and were still waiting on a response. (ECF 21-16, "Def. Ex. 12" at 1:15-1:30.) EMS arrived on the scene at 5:39 p.m. (Wachterhauser Decl. ¶ 14.)

Plaintiff was charged with Obstructing the Administration of Law or other Governmental Function, pursuant to N.J. Rev. Stat. § 2C:29-1A; Resisting Arrest, pursuant to § 2C:29-2A(1); Possession, Use, or Being Under the Influence, pursuant to § 2C:35-10B(1), and Possession of Certain Prescription Drugs pursuant to § 2C:35-24, respectively. (*See* Def. Ex. 3 at 4.) Plaintiff pled guilty to the charges on April 27, 2021 on the condition that he complete a diversion program

---

[3] Sergeant Wachterhauser's initial call requesting EMS response is also documented on the New Jersey Transit Police Department ("NJTPD") call logs dated March 19, 2021. (Def. Ex. 3 at 5.)

[4] Sergeant Wachterhauser informed Plaintiff six times over the course of the next two hours (at 3:42 p.m., 3:48 p.m., 3:49 p.m., 3:51 p.m., 3:54 p.m., and 3:56 p.m.) that an ambulance was coming and that the NJTPD could not make EMS come any faster. (ECF 21-14, "Def. Ex. 10" at 8:00-8:16; ECF 21-15, "Def. Ex. 11" at 1:25-1:35, 2:35-2:44, 5:11- 5:40, 7:32-7:40, and 9:45-10:00.)

at Newark Community Solutions.  (*Id.* at 6-8.)  On June 9, 2021, Plaintiff successfully completed the program and all charges were dismissed.  (*Id.* at 9.)

Plaintiff filed the instant Complaint on March 16, 2023.  (*See* Compl.)  Plaintiff asserts claims of excessive force (Count I) and failure to provide medical care (Count II), in violation of his Fourth and Eighth Amendment rights, pursuant to 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2 (Count III).  (Compl. ¶¶ 23, 27, 29.)  Plaintiff has withdrawn the claim for Loss of Consortium (Count IV).  (Pl. Opp. at 9.)

## II. LEGAL STANDARD

A moving party is entitled to summary judgment as a matter of law where "the movant shows that there is no genuine dispute as to any material fact."  FED. R. CIV. P. 56(a).  A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment.  *Id.*  A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

However, the Supreme Court in *Scott v. Harris* determined that the existence of a videotape capturing the events underlying an excessive force claim presents an "added wrinkle" to the general standard requiring courts to construe facts in the light most favorable to the non-moving

party. 550 U.S. 372, 378 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Id.* at 380. Under such circumstances, a court must view "the facts in the light depicted by the videotape." *Id.* at 381. *See also Knight v. Walton*, 660 F. App'x. 110, 112 (3d Cir. 2016) ("Where there is a video recording of the relevant events, the Court views the facts as depicted in the recording, rather than in the non-movant's favor, whenever the recording 'blatantly contradict[s]' the non-movant's version such that 'no reasonable jury could believe it.'") (alteration original) (quoting *Scott*, 550 U.S. at 380).

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*

*Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

### III. ANALYSIS

Defendants move for summary judgment on multiple grounds. In addition to arguing that Plaintiff fails to allege facts or produce evidence to create genuine issues of material fact as to his § 1983 and NJCRA claims, Defendants argue that they are entitled to qualified immunity. The Court will address each argument in turn.

#### A. Section 1983 and NJCRA Claims[5]

In general, 42 U.S.C. § 1983 establishes a cause of action "against any person who, acting under color of state law, deprives another of his or her federal rights." *Wright v. City of Phila.*, 409 F.3d 595, 599 (3d Cir. 2005). To succeed on a claim under § 1983, a plaintiff must show "(1) the violation of a right secured by the Constitution or laws of the United States and (2) that the alleged deprivation was committed or caused by a person acting under color of state law." *Roberson v. Borough of Glassboro*, 570 F. Supp. 3d 221, 226 (D.N.J. 2021) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

The NJCRA "is a state law corollary to 42 U.S.C. § 1983—it creates a private right of action for the violation of civil rights secured under the New Jersey Constitution." *Armstrong v. Sherman*, No. 09-716, 2010 WL 2483911, at *5 (D.N.J. June 4, 2010). For this reason, "[t]his district has repeatedly interpreted NJCRA analogously to § 1983." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011) (collecting cases). Thus, "the Court will analyze Plaintiffs'

---

[5] The Complaint lists Count I as "Excessive Force/Assault and Battery[.]" (*See* Compl. at 3.) This is the only reference in the Complaint to assault or battery. To the extent that Plaintiff is attempting to plead separate claims for assault and battery, Plaintiff has not met the pleading standards of Rule 8(a). *See* FED. R. CIV. PROC. 8.

7

NJCRA claims through the lens of § 1983." *Id. See also Norcross v. Town of Hammonton*, No. 04-2536, 2008 WL 9027248, at *4 (D.N.J. Feb. 5, 2008) ("This Court sees no reason to conclude that in the context of a claim for excessive force during an arrest, the standard under the New Jersey Constitution for evaluating those claims is different from that under the United States Constitution." (citations omitted)).

There is no dispute that Defendants acted under the color of state law when they initiated Plaintiff's arrest. The issue is whether Defendants violated Plaintiff's constitutional rights in so doing. Plaintiff alleges that Defendants "physically harmed and contacted [him] without justification" causing him to "suffer[] excessive force" (Compl. ¶ 23) and "showed deliberate indifference to Plaintiff Mortillaro's serious medical needs." (*Id*. ¶ 25.) Thus, the specific questions before the Court are (1) whether Defendants used excessive force in violation of Plaintiff's Fourth Amendment rights and (2) whether Defendants failed to provide medical care in violation of Plaintiff's Eighth Amendment rights when they arrested Plaintiff.

### i. Excessive Force

The right to be free from excessive force during a seizure emanates from the Fourth Amendment's prohibition against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). "A seizure occurs only 'when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968)). "A cause of action exists under § 1983 when a law enforcement officer uses force so excessive that it violates" the Fourth Amendment's protection from unreasonable search and seizure. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633-34 (3d Cir. 1995). "Police officers are privileged to commit a battery pursuant

8

to a lawful arrest, but the privilege is negated by the use of excessive force." *Groman*, 47 F.3d at 634.

"A claim for excessive force under the Fourth Amendment requires a plaintiff to show that a seizure occurred and that it was unreasonable." *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002); *see Graham*, 490 U.S at 396. Determining whether use of force is reasonable requires careful attention to the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *See Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). Other factors include whether the force applied caused injury,

> the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the police officers' action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

*Estate of Smith v. Marasco*, 430 F.3d 140, 150 (3d Cir. 2005). While the court may consider the suspect's injury, "the central issue is the force the officers employed (and whether it was reasonable under the circumstances), not the injury they caused." *Flood v. Schaefer*, 439 F. App'x. 179, 182 (3d Cir. 2012).

Courts must weigh these factors objectively and "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396–97 (citations omitted). As a result, a court must consider whether the officers' actions were "objectively reasonable in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation." *Norcross*, 2008 WL 9027248, at *4 (quoting *Graham*, 490 U.S. at 397).

9

Defendants argue that the force used was objectively reasonable considering the crimes at issue, the safety threat that Plaintiff posed to the officers and to the larger public, and the fact that Plaintiff was actively resisting and attempting to evade arrest. (Def. Br. at 16.) The Court finds that the force used by Officers Marulanda and Tyler was objectively reasonable under the circumstances.

The factors used to weigh the reasonableness of police conduct support this conclusion. This Court must balance (1) the severity of the crime, (2) whether the suspect posed an immediate threat, and (3) whether the suspect was resisting or evading arrest. *See Graham*, 490 U.S. at 396. Plaintiff committed four crimes under New Jersey law, including obstruction, resisting arrest, unlawful possession of prescription drugs and being under the influence of a controlled substance. (Def. Ex. 3 at 4.) While these are not particularly serious crimes, courts in this district have weighed these factors and denied claims of excessive force where the crime involved was similarly not "of a very serious nature[.]" *Hickman v. Borough*, No. 15–3578 , 2017 WL 1197806, at *12 (D.N.J. Mar. 31, 2017) (granting summary judgment in 1983 excessive force case where crime at issue was disorderly conduct[6]). Importantly, a non-severe crime does not preclude finding that the force used was objectively reasonable. *See id.*

The remaining *Graham* factors favor Defendants. Plaintiff was found "passed out" on the bathroom floor of a public train with a ketamine needle in his arm. (Def. Ex. 3 at 3; Def. SOMF ¶ 7.) Once Defendants removed him from the train, Plaintiff did not respond to the officers' inquiries, did not comply with their requests, and appeared agitated. (Def. Ex. 2 at 20:35-25:50.) Plaintiff was also intoxicated. (Def. Ex. 3 at 3.) The officers knew that Plaintiff possessed at least

---

[6] In *Hickman*, the plaintiff also did not evade or resist arrest. 2017 WL 1197806, at *12. The Court still found the officers' "limited" use of force "in a tense and violent situation" was objectively reasonable. *Id.* at *13.

10

one hypodermic needle—a dangerous instrument which Plaintiff could have used as a weapon against the officers or other New Jersey Transit passengers and crew. (Def. SOMF ¶ 11.) Defendant Officers Marulanda and Tyler each testified that they did not know what else Plaintiff had on his person, and they feared that he was reaching for more needles. (*Id.* ¶ 10.) Plaintiff can be seen on body worn camera footage continuously reaching into his bag and pockets, despite the officers' repeated demands not to do so. (Def. Ex. 2 at 18:11-24:41.) These circumstances establish that Plaintiff posed an immediate safety threat to the officers and to the public. Moreover, this threat ultimately materialized when Plaintiff initiated a physical altercation with the officers by resisting arrest. (*Id.* at 1:06-1:15) (Plaintiff grabbed Officer Marulanda's arm and wrestled the officers on the platform.) Finally, the video surveillance depicted Plaintiff resisting and attempting to evade the officers' arrest, satisfying the last *Graham* factor. (*See* Def. Ex. 2; Def. Ex. 8.)

The additional factors articulated by the Third Circuit also favor Defendants. *See Estate of Smith*, 430 F.3d at 150. Defendants use of force here occurred "in the context of effecting an arrest." *Id.* The entire encounter from when Defendants initiated the arrest to their use of force to handcuff Plaintiff lasted no more than ten seconds, a significantly short "duration[.]" *Id.* Though Plaintiff did not possess a traditional weapon, his possession of multiple needles posed a safety hazard to Defendants. (Def. SOMF ¶ 11; Def. Ex. 3 at 4.) Plaintiff's intoxicated and uncontrolled state increased the likelihood that Plaintiff was "violent or dangerous." *Id.* Therefore, the force the officers employed for ten seconds to lawfully arrest a physically resistant suspect was "objectively reasonable in light of the facts and circumstances confronting them[.]" *Graham*, 490 U.S. at 397.

Plaintiff claims he "was not a threat to anyone," that the use of force was "clearly disproportionate" because of the injuries that Plaintiff suffered, and that the video surveillance

11

presents a genuine issue of material fact to be decided by a jury. (Pl. Opp. at 4-5.) First, the Court notes that the "central" question presented is whether the force the officers employed "was reasonable under the circumstances[], *not the injury they caused*." *Flood*, 439 F. App'x. at 182 (emphasis added). It is incontrovertible that unarmed suspects can still pose a threat to police and to public safety. *See Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011) (granting summary judgment for defendants where officers used deadly force against an unarmed plaintiff). At oral argument, Plaintiff's counsel conceded Plaintiff's possession of the hypodermic needle posed, "some level of threat" to the defendants. (Oral Arg. Tr., 23:5, Mar. 6, 2025.) Defendants can be heard on body worn camera warning arriving officers about the probability of needles on Plaintiff's person, a clear recognition of the potential danger the needles presented. (*See* Def. Ex. at 27:02- 28:50.) Plaintiff's possession of the hypodermic needle while physically resisting police in an intoxicated state posed a threat sufficient to justify the defendants' use of force to effectuate the arrest pursuant to *Grahm*.

Plaintiff also argues that a genuine issue of material fact exists "as to whether Defendants used force maliciously and sadistically to cause harm." (Pl. Opp. at 5.) The video footage fails to support Plaintiff's assertions that the officers acted maliciously or sadistically. "Maliciously and sadistically" is a legal term of art in Eighth Amendment jurisprudence related to claims against prison officials and is therefore inapplicable to Plaintiff's claims under the Fourth Amendment. *See Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) ("[T]he central question is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.") (citation omitted). Both the legal term of art and the plain meaning of

"maliciously" and "sadistically" reflect an intent to cause harm.[7] *See Spruill v. Gillis*, 372 F.3d 218, 237 (3d Cir. 2004) (considering whether defendants acted "maliciously and sadistically" and assessing whether their actions were "intended to inflict pain without any medical justification."). Plaintiff presents no evidence that the officers intended to harm or humiliate him, and the video evidence directly contravenes such an account.

Finally, Plaintiff misapplies the findings in *Bocchino v. City of Atlantic City* that "juries, not the court, should view video evidence and reach their own conclusions." (Pl. Opp. at 4 (citing *Bocchino v. City of Atl. City*, 179 F. Supp. 3d 387 (D.N.J. 2016))). In *Bocchino*, the surveillance video was "not a complete version of the events giving rise to Plaintiff's excessive force claims" because it did not contain audio. 179 F. Supp. 3d at 397. Here, the body worn camera footage contains audio. (*See e.g.*, Def. Exs. 2, 10, 11, 12.) The video evidence from Officer Marulanda's body worn camera and Track 4 platform footage together provide "a complete version of the events[.]" *Bocchino*, 179 F. Supp. 3d at 397.

Indeed, all the cases on which Plaintiff relies can be similarly distinguished because of issues with the video evidence. *See Paterson v. City of Wildwood*, 354 F. App'x 695, 698 (3d Cir. 2009) (video evidence "d[id] not portray the actual incident"); *Ringgold v. Keller*, 608 F. App'x 102, 104-05 (3d Cir. 2015) (video evidence did not clearly depict each officer's participation during alleged instance of excessive force); *Fried v. Tetzlaf*, 2014 WL 2861098, at *7 (D.N.J. June 24, 2014) (evidence at issue was audiotape without any accompanying video); *Sorrel v. Tropicana*

---

[7] Merriam-Webster defines "maliciously" as "having or showing a desire to cause harm to someone: given to, marked by, or arising from malice" and "sadistically" as "taking pleasure in the infliction of pain, punishment, or humiliation on others." Merriam-Webster, *Maliciously*, https://www.merriam-webster.com/dictionary/maliciously (last visited Feb. 25, 2025); Merriam-Webster, *Sadistically*, https://www.merriam-webster.com/dictionary/sadistically (last visited Feb. 25, 2025).

*Atl. City Corp.*, 2014 WL 7336699, at *2-3 (D.N.J. Dec. 19, 2014) (video evidence deemed incomplete because it "cuts out" and was unaccompanied by audio). In contrast to the examples that Plaintiff cites, the video evidence here is robust, and it clearly portrays the events in dispute. The platform surveillance footage depicts the entire incident in full view, *see* Ex. 8, and the officers' interactions with Plaintiff from first encounter through EMS's arrival can be seen and heard on body worn footage, *see* Def. Exs. 2, 10-12.

Not only do courts in this district grant summary judgment in excessive force cases where there is video evidence that captures the incident, *see e.g.*, *Ramon v. Stone*, 2023 WL 3092189, at *7 (D.N.J. Apr. 26, 2023); *Hickman*, 2017 WL 1197806, at *12, but the Supreme Court has instructed that "where there are video recordings of the incidents in question" courts must view "the facts in the light depicted by the videotape." *Scott*, 550 U.S. 372 at 380-81 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment.")

Here, the video evidence is conclusive. (*See* Def. Exs. 2, 8, 10-12.) There "are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened." *Scott*, 550 U.S. at 378. The Court therefore must view the facts here "in the light depicted by the videotape." *Id.* at 381.

Plaintiff's version of events is contradicted by the video footage of the incident. The video evidence here shows that the Defendants only used force because Plaintiff resisted their arrest. The officers did not physically harm, demean, or menace Plaintiff at any point prior to his arrest. (Def. Ex. 2 at 20:36-25:32.) Once Plaintiff began to physically resist, Defendants used force during a ten second period to subdue and handcuff him. (*See* Def. Ex. 8 at 1:06-1:15.) The

officers did not punch, strike, kick, or hit Plaintiff while effecting the arrest. (Def. SOMF ¶ 19.) Had Plaintiff not physically resisted, Defendants would not have been required to use force to effectuate the arrest.

For these reasons, the Court finds that there is no genuine dispute of material fact as to whether Defendants' use of force was reasonable under the circumstances, and the Court grants summary judgment in their favor on Counts I and III.

### ii. Cruel and Unusual Punishment

The government has an obligation to provide medical care for those whom it is punishing by incarceration. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). An inmate or arrestee must rely on prison authorities or arresting officers, respectively, to treat his medical needs; if the authorities fail to do so, those needs will not be met. *Id.* The Supreme Court has concluded that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment. This is true [in circumstances where] the indifference is manifested . . . by prison guards in *intentionally* denying or delaying access to medical care[.]" *Id.* at 104-05 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)) (emphasis added). Deliberate indifference to a prisoner or arrestee's serious illness or injury may therefore state a cause of action under § 1983. *Estelle*, 429 U.S. at 105.

"This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Id.* "Similarly, in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Id.* at 105-06. For example, an

allegation of negligence in "diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id.* at 106. To state a cognizable claim, a plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.*

In recognition that deliberate indifference to medical needs "entails something more than negligence," the Supreme Court clarified that a finding of deliberate indifference requires a guilty mind, which "is the equivalent of acting recklessly." *Farmer v. Brennan*, 511 U.S. 825, 826 (1994). Therefore, to be held liable under the Eighth Amendment, a prison guard or arresting officer must consciously disregard "a substantial risk of serious harm" by "failing to take reasonable measures to abate it." *Id.* at 847.

The Third Circuit has identified several scenarios that satisfy the deliberate indifference standard articulated in *Estelle*, including where authorities "deny reasonable requests for medical treatment" resulting in undue suffering or the threat of tangible residual injury to the arrestee, or where "knowledge of the need for medical care is accompanied by the intentional refusal to provide that care." *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (internal citations and quotations omitted). Neither of these circumstances are present in this record.

From the inception of Plaintiff's injury through the arrival of EMS, Defendants took reasonable measures to secure emergency medical care to treat Plaintiff's injury. Sergeant Wachterhauser called EMS to request an ambulance within five minutes of Plaintiff's injury. (Def. SOMF ¶ 26.) No reasonable juror would conclude that a request for medical attention within five minutes of injury constitutes "deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. In any event, over the next hour and fifty minutes, Sergeant Wachterhauser called EMS two more times to check on the status of the ambulance. (Def. SOMF ¶ 28.) Indeed, the officers

16

can be heard on body worn footage informing Plaintiff six times about the status of the ambulance and their attempts to reach EMS. (Def. SOMF ¶ 28.)

Plaintiff proffers a minute-by-minute analysis of a ten-minute period, from when the officers initiated the arrest to when Plaintiff was brought a wheelchair and taken off the platform, to argue that the officers were deliberately indifferent to Plaintiff's medical needs. (*See* Pl. Opp. at 6.) The Court finds this recitation of events misleading and, in any event, unavailing. It is also belied by the record. During this ten-minute time frame, Sergeant Wachterhauser made the initial request for an ambulance for the Plaintiff's leg pain. (Def. SOMF ¶ 21.) No reasonable jury could find a request for medical attention within five minutes of injury to be "intentional refusal to provide" care. *Spruill*, 372 F.3d at 235.

Plaintiff also contends that the two-hour delay in emergency medical assistance constitutes cruel and unusual Punishment under the Eighth Amendment.[8] (Pl. Opp. at 6.) While the delay in medical care was inexcusable, it was not caused or worsened by Defendants' action. The NJTPD officers did not "deny reasonable requests for medical treatment." *Spruill*, 372 F.3d at 235. NJTPD and its officers have no control over the response time of EMS.[9] (Wachterhauser Decl. ¶ 15) The officers still took affirmative steps over the two-hour period to procure medical care. NJTPD inquired with EMS two more times about the status of the ambulance and also kept Plaintiff abreast of those communications. (Def. SOMF ¶ 28.)

---

[8] Plaintiff characterizes the delay from EMS as "several hours" in his opposition papers. (Pl. Opp. at 6.) This is an incorrect characterization of the record. EMS arrived on scene at 5:39 p.m., exactly **two** hours after Sergeant Wachterhauser called for an ambulance (3:39 p.m.). (Wachterhauser Decl. ¶ 14.) Plaintiff was arrested and injured at 3:34 p.m. (Def. SOMF ¶ 24.)

[9] The New Jersey Department of Health, not the NJTPD, runs and oversees Emergency Medical Services, including ambulatory services. State of New Jersey Department of Health, *Emergency Medical Services*, https://www.nj.gov/health/ems/ (last visited Feb. 23, 2025).

As evidenced by Officer Marulanda's body worn camera footage, there was another critical injury on Track 4 at Newark Penn shortly before Plaintiff was arrested and suffered a broken hip. The footage begins with Defendants Marulanda, Tyler, and at least six other officers treating a critically injured, unresponsive individual on the train tracks with a bleeding headwound. (Def. Ex. 2 at 00:05-15:33.) Officer Tyler's Incident Report confirms that he was responding to a first aid call concerning a fallen pedestrian on Track 4 when he received information about Plaintiff on passed out on train 7525. (Def. Ex. 3 at 3.) This concurrent emergency at Newark Penn Station may have contributed to EMS's delay on March 19, 2021.

Therefore, Plaintiff has failed to provide any evidence to prove that Defendants either denied Plaintiff's reasonable requests for medical treatment or intentionally refused to provide medical care. *See Spruill*, 372 F.3d at 235. The Court grants summary judgment for Defendants on Count II.

### B. Qualified Immunity

Even if Plaintiffs' § 1983 and NJCRA claims could survive summary judgment, Defendants' qualified immunity would defeat these claims. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity "shields federal and state officials from money damages" unless plaintiff can establish "(1) that the [government] official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"To be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Diana v. Oliphant*, 441 F. App'x 76, 80 (3d Cir. 2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). *See also Curley v. Klem*, 499 F.3d 199, 207 (3d Cir. 2007) ("The question at this second step is whether the right that was violated was clearly established, or, in other words, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001))).

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Olson v. Ako*, 724 F. App'x 160, 164 (3d Cir. 2018) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "[W]hether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury." *Curley*, 499 F.3d. at 211.

Both prongs of this test compel the Court to find that qualified immunity shields Defendants from liability. As discussed above, Plaintiff has failed to identify evidence demonstrating that Defendants violated Plaintiff's Fourth Amendment rights by using force that was objectively unreasonable under the circumstances. An officer conducting a search or seizure is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment. *See Anderson*, 483 U.S. at 641.

Even if a reasonable juror could find a Fourth Amendment violation, Plaintiff's right to be free from the use of force by arresting officers was not "clearly established." Plaintiff has not cited—and the Court is unaware of—any case law stating that police conduct analogous to Defendants' constitutes a Fourth Amendment violation. *See City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021) (noting that "clearly established" rights must be established with

19

"specificity" in Fourth Amendment cases). Because the evidence cannot show that Defendants violated Plaintiff's clearly established Fourth Amendment rights, qualified immunity defeats Plaintiff's § 1983 and NJCRA claims.

Plaintiff has also failed to identify any evidence that Defendants were "incompetent" or "knowingly violated the law" when effectuating Plaintiff's lawful arrest. *See Olson,* 724 F. App'x at 164. At worst, Defendants made reasonable mistakes "in circumstances that [were] tense, uncertain, and rapidly evolving" based on the information available to them at the time. *Samoles v. Lacey Tp.*, No. 12–3066, 2014 WL 2602251, at *6 (quoting *Graham*, 490 U.S. at 396–97). Defendants are entitled to qualified immunity for their actions here.

### IV.   CONCLUSION

Here, the record is devoid of any facts which demonstrate that Defendants violated Plaintiff's Fourth and Eighth Amendment rights. As a result, there is no genuine issue of material fact and Defendants are granted summary judgment as to Plaintiff's § 1983 and NJCRA claims. For the reasons set forth above, Defendants motion (ECF 21) is **GRANTED**. An appropriate Order accompanies this Opinion.

Dated: March 10, 2025

　　　　　　　　　　　　　　　　　　　　　　　　　　 /s/ Jamel K. Semper   
　　　　　　　　　　　　　　　　　　　　　　　　　　**HON. JAMEL K. SEMPER**
　　　　　　　　　　　　　　　　　　　　　　　　　　**United States District Judge**

Orig:  Clerk
cc:    Jose R. Almonte, U.S.M.J
       Parties